IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE PENNSYLVANIA BUILDERS ASSOCIATION BENEFITS TRUST, et al., Plaintiffs | : : : : | Civil Action No. 1:07-CV-561 |
| v. | : : | (Chief Judge Kane) |
| CAPITAL BLUECROSS, et al., Defendants | : : | |

**MEMORANDUM**

Before the Court is Defendants' motion to dismiss Plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 8.) Both parties have filed briefs in connection with the motion, and the motion is ripe for disposition. For the reasons that follow, the motion will be denied.

**I.   BACKGROUND**[1]

Plaintiffs in this action are the Pennsylvania Builders Association Benefits Trust, a multi-employer health and welfare fund comprising "various members of the building and shelter industry in Pennsylvania" (Compl. ¶¶ 1, 9), and the Trustees thereof (collectively "Builders Trust"). Defendants are Capital BlueCross and Capital Advantage Insurance Co. (collectively "Capital"), which engage "in the business of providing healthcare and other welfare coverage." (Compl. ¶ 5.) For several years, Builders Trust and Capital maintained a contractual relationship to provide healthcare benefits to Builders Trust's members. (Compl. ¶ 16.) The instant motion

---

[1] The majority of the facts that follow are taken from the allegations contained within the complaint, and must be accepted as true for the purposes of resolving Defendants' motion to dismiss. Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007). The remainder of the facts are taken from the contract attached as Exhibit A to Defendants' brief in opposition. That contract is an "undisputedly authentic document" upon which Plaintiffs' claims are based," and therefore may be considered by the Court on a motion to dismiss. Pension Ben. Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

to dismiss calls upon the Court to consider how that contractual relationship came to an end, and the effect that such cessation had on Capital's post-contractual obligations to Builders Trust.

### A. The 2005 Contract

In 2005, Builders Trust and Capital negotiated a contract ("2005 Contract"), under which Capital was to provide healthcare coverage to Builders Trust's members from April 1, 2005, to March 31, 2006. (Compl. ¶¶ 23, 25.) As part of the 2005 Contract, the parties agreed to a "Retrospective Credit Financial Arrangement" for calculating the subscription rates for Builders Trust's members. Under the Rate Arrangement, Capital agreed to adjust its rates for Builders Trust's members according to the amount of money held in a Rate Stabilization Fund ("RSF"). (Compl. ¶¶ 28-30.) The RSF, which is central to Builders Trust's complaint, "was established for use in stabilizing the . . . experience rate for all of Capital's healthcare products offered to [Builders Trust's] members." (Compl. ¶ 31.) By the terms of the Rate Arrangement, the balance of the RSF was to be calculated thus:

> The balance in the [Builders Trust's] RSF shall be based upon an Interim and a Final Settlement. The Interim Settlement will be prepared in or about October 2006, and will include all claims incurred during the Contract experience period and processed through September 30, 2006. Thereafter, a Final Settlement will be prepared in or about July 2007 and will include claims incurred during the Contract experience period and processed through June 30, 2007. Based upon the Interim and Final Settlements, the [Builders Trust's RSF] shall be determined as follows:
>
> 1. If the total income received during the base experience period exceeds the total of claims incurred plus retention, a surplus results and will be added to the RSF.
>
> 2. If the total income received during the base experience period is less than the total of incurred claims plus retention, a deficit results and will be deducted from the RSF.

(Compl. ¶ 35.) As of March 31, 2006, the RSF had a surplus of over $13 million. (Compl. ¶ 58.) Builders Trust now seeks to recover that surplus.

Under Capital's theory of the case, Builders Trust's entitlement to the RSF surplus is governed by section I of the Rate Agreement.[2] That section provides that "six months after *termination* of the Group Contract for any reason," Capital would calculate a final settlement of the RSF, after which: (1) any surplus in the RSF balance would be refunded to Builders Trust; or (2) any deficit in the RSF balance would be paid by Builders Trust. (Doc. No. 9-2, at 21-22; Ex. "A") (emphasis added). Based on the language of section I, Capital suggests that Builders Trust's entitlement to the RSF surplus under section I is dependent on the termination of the 2005 Contract.

Under section 8 of the 2005 Contract, the contract terminated if the parties could not "agree upon a rate renewal." In such an event, section 8.2 provides that the 2005 Contract would "automatically terminate at the end of the Contract Year during which Capital presented the rate renewal, unless the parties agree[d] in writing to an extension thereof." The contract also separately provides—under section 8.3—for termination by Builders Trust either without cause "by giving written notice to Capital at least sixty (60) calendar days in advance" or with cause by giving "thirty (30) calendar days written notice in the event of a material breach by Capital if Capital fails to cure such breach within fifteen business days of receipt of the notice to terminate." Finally, under section 8.4, Capital could terminate the contract if "any payment due to Capital, including premiums, [was] not made within thirty-one (31) days after the date it is

---

[2] Under Builders Trust's theory of the case, Builders Trust's entitlement to the RSF surplus stems from the RSF's status as a "plan asset," not from the language of the Rate Arrangement.

due," or if Builders Trust "performed an act or practice constituting fraud or intentionally misrepresented material facts in connection with coverage." Additionally, Capital could terminate the Contract if any of Builders Trust's members violated any of the "participation or contribution rules," or if Capital stopped offering the coverage.

### B. The 2006 Contract

Pursuant to the 2005 Contract, between April 1, 2005, and March 31, 2006, Builders Trust paid premiums to Capital, Capital provided healthcare coverage for Builders Trust's members, and neither Builders Trust nor Capital expressed any intention to terminate the contract. On February 1, 2006, Capital sent Builders Trust a letter "regarding revised rates for the period from April 1, 2006 through March 31, 2007," (Compl. ¶ 38), and attached a "Program Acceptance Form" specifying the revised rates for the 2006-2007 period. Subsequently, a representative of Builders Trust signed the Program Acceptance Form and returned it to Capital. (Compl. ¶¶ 39-41.)

On March 31, 2006, Capital emailed Builders Trust a "standard form association contract" for the 2006-2007 period. (Compl. ¶¶ 42-45.) Finding the contract unacceptable, Builders Trust replied to Capital on April 6, 2006, that it would not accept the "standard form association contract," but that it wished to negotiate agreeable terms. (Compl. ¶¶ 46, 47.) On April 10, 2006, Capital responded that the proposed contract "followed [its] purported 'new standard form association contract' and that [the] form contract would apply to the 2006 contract year" (Compl. ¶ 48), and that Capital "did not 'consider [the parties'] relationship during the 2005 contract year as continuing into the 2006 contract year'" (Compl. ¶ 49).

Despite the exchange related to the form contract, on April 21, 2006, Builders Trust paid

the first of its premiums for the 2006-2007 period to Capital, which Capital accepted. (Compl. ¶ 50.) Through March 31, 2007, Builders Trust continued to pay premiums to Capital, and Capital continued to provide healthcare coverage for Builders Trust's members. (Compl. ¶¶ 54, 57.) In that time, however, Builders Trust and Capital could not agree to a formal written contract governing the period between April 1, 2006, and March 31, 2007.

### C. Procedural Background

On March 23, 2007, Builders Trust brought this action against Capital, alleging that Capital had breached fiduciary duties owed to Builders Trust under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., and seeking declaratory relief. (Doc. No. 1.) On May 7, 2007, Capital filed the instant motion to dismiss (Doc. No. 8) and a brief in support of the motion (Doc. No. 9). Builders Trust filed a timely brief in opposition to the motion to dismiss (Doc. No. 10), to which Capital replied (Doc. No. 19).

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) is properly granted when, accepting all factual allegations and inferences as true, the moving party is entitled to judgment as a matter of law. Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990). Although review is generally limited to the face of the complaint, the court "may also consider matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.2 (3d Cir. 1997); see also In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997). Although the moving party bears the burden of showing that no claim has been stated, Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2007), the complaint must allege facts sufficient to "raise a

right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)," Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007) (internal citations omitted).  In addition, although for the purposes of a motion to dismiss pursuant to Rule 12(b)(6) the Court must accept as true all factual allegations in the complaint, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation."  Papasan v. Allain, 478 U.S. 265, 286 (1986).

## III.    DISCUSSION

Capital moves for dismissal on two grounds.  First, Capital argues that Builders Trust has no contractual entitlement to the RSF surplus because the 2005 Contract did not "terminate."  Second, Capital argues that Builders Trust's claim for breach of a fiduciary duty should be dismissed because Builders Trust has not alleged that Capital acted in bad faith.  The Court will address each argument in turn.

### A.    Whether the 2005 Contract "terminated"

Capital's theory at the pleadings stage is that the 2005 Contract did not "terminate"—it "expired"—and therefore Capital owes no obligation to refund the RSF surplus under section I of the Rate Arrangement.  The Court disagrees.  Although some contracts draw distinctions between expiration and termination, the 2005 Contract does not.  Rather, a careful review of the 2005 Contract reveals that it either renewed or terminated.

As an initial matter, Builders Trust argues that termination and expiration are synonymous.  In legal usage, depending on context, the words termination and expiration can be synonyms, but they are not always.  Black's Law Dictionary defines termination as either "[t]he act of ending something" or "[t]he end of something in time or existence; conclusion or

discontinuance." Black's Law Dictionary 1511 (8th ed. 2004). Expiration is defined as "[a] coming to an end; esp., a formal termination on a closing date." Black's Law Dictionary 619 (8th ed. 2004). These definitions reflect that while terminate can be either transitive or intransitive, expire is exclusively intransitive. As our sister court has recognized, when the transitive form of terminate is used, the words terminate and expire may be synonymous. Children's Hosp. of Philadelphia v. Independence Blue Cross, 89 F. Supp. 2d 630, 633 n.3 (E.D. Pa. 2000). By contrast, when the transitive form is used, the words cannot be synonymous.

In the case at bar, Capital focuses exclusively on the transitive form of terminate used in the 2005 Contract. Sections 8.3 and 8.4 of the contract used terminate in the transitive and respectively describe Builders Trust or Capital terminating the contract. However, in its briefs, Capital ignores section 8.2, which states that "[i]f the parties are unable to agree upon a rate renewal, then [the 2005 Contract] will automatically terminate at the end of the Contract Year . . . unless the parties agree in writing to an extension thereof." Thus, section 8.2 uses terminate in the intransitive. In other words, terminate in the 2005 Contract can be either transitive or intransitive, depending on the context.[3]

In the context of section I of the Rate Arrangement, which is the provision governing Builders Trust's entitlement to the RSF surplus, the contract states that "six months after termination of the Group Contract for any reason, Capital will calculate a final settlement of the

---

[3] Sections 8.1 and 8.2, when read together, suggest that on March 31, 2006, the 2005 Contract either renewed or automatically terminated, depending on whether the parties were able to agree upon a "rate renewal." Because the Court must presume all facts as pleaded in the complaint, it would seem that, in the absence of a separate agreement, the 2005 Contract automatically terminated. However, the Court need not specifically decide whether section 8.2 applies, because the unprovided-for expiration scenario is equivalent to a termination under the terms of the 2005 Contract.

RSF . . . ." In section I, termination encompasses both the transitive and intransitive forms of the verb terminate. Section I, therefore, requires settlement of the RSF if either of the parties terminate the 2005 Contract, or if the 2005 Contract simply terminates on its own at the end of the contract year.

Stated another way, Capital's argument fails at the pleadings stage because the language of the Rate Arrangement suggests that the 2005 Contract can be terminated by one of the parties or it can terminate "automatically . . . at the end of the Contract Year," as provided for in section 8.2 or otherwise. Indeed, as Builders Trust argues: "Capital does not refer to any provision in the 2005 Contract that uses the word 'expiration' and the contractual provisions governing the end of the 2005 term uses [sic] the words 'term' and 'termination.'" (Doc. No. 10, at 19.)

Valley Juice Ltd., Inc. v. Evian Waters of France, Inc., 87 F.3d 604, 609 (2d Cir. 1996), cited by Capital, is instructive. In Valley Juice, the Second Circuit found that the words "termination" and "expiration" in the contract had distinct meanings. Id. In making this finding, the court reasoned:

> The word "termination" is, in the context of this contract, a term of art. Paragraph 3, headed "*TERMINATION OF AGREEMENT*," specifies that "prior to the *expiration* of the Agreement," Evian may "*terminate* this Agreement and the Distributor's rights hereunder" under certain conditions. Hence, "termination" of the Agreement – the contingency to which [the contract] speaks – is something distinct from "expiration." In a ¶ 3 termination, Evian ends the Agreement before the completion of the renewable one year term specified . . . .

Id. (internal citations omitted). Thus, the contract in Valley Juice delineated between a natural expiration and an early termination. Id. Here, by contrast, the 2005 Contract makes no such distinction. Rather, the 2005 Contract provides for both "automatic" termination and termination

by the parties.

Given the plain language of the 2005 Contract, the Court finds that Capital's perceived distinction between expiration and termination is a distinction without a difference. Section I of the Rate Arrangement, which governs Builders Trust's entitlement to the RSF surplus, contemplates "termination . . . for any reason." It does not suggest that the termination must have been caused by either party or foreclose the possibility of an automatic termination. Accordingly, Capital's motion to dismiss must be denied.

### B.     Whether Builders Trust's complaint alleges a breach of fiduciary duty

Capital's second argument in support of its motion to dismiss is that Builders Trust's complaint fails to state a claim for breach of fiduciary duty because the complaint does not allege that Capital acted in bad faith. In Capital's view, a bona fide dispute over the interpretation of the contract cannot amount to a breach of a fiduciary duty. In support of its argument, Capital cites the "principle that [a plaintiff] may not assert a claim for breach of fiduciary duty based upon a dispute over the interpretation of a contract." (Doc. No. 19, at 9.) After reviewing the parties' submissions, however, the Court is satisfied that Builders Trust's complaint alleges a breach of fiduciary duty under 29 U.S.C. § 1104(a),[4] which imposes a duty of loyalty upon

---

[4] Section 1104(a)(1) provides as follows:

> (1) Subject to [certain limitations], a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>     (A) for the exclusive purpose of:
>         (i) providing benefits to participants and their beneficiaries; and
>         (ii) defraying reasonable expenses of administering the plan;

9

fiduciaries. Specifically, § 1104 compels a fiduciary to fulfill its duties "solely in the interest of the participants and beneficiaries and . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [other ERISA provisions]." 29 U.S.C. § 1104(a)(1)(D). In this case, Builders Trust has alleged that Capital violated the plan's terms by refusing to refund the RSF surplus, and more directly that "Capital has acted in its own self-interest to the severe detriment of the [Builders Trust], [its] members and their beneficiaries by failing to return at least the [$13 million] surplus in the RSF to the [Builders Trust]." (Compl. ¶ 65.) Because Builders Trust has adequately pleaded that Capital's actions were motivated by self-interest rather than "solely in the interest of the participants and beneficiaries," Capital's motion to dismiss must be denied.

## IV.    CONCLUSION

For the foregoing reasons, Capital's motion to dismiss Builders Trust' complaint will be denied. An appropriate order follows.

---

> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

29 U.S.C. § 1104(a)(1).

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **THE PENNSYLVANIA BUILDERS ASSOCIATION BENEFITS TRUST, et al.,** : <br>    **Plaintiffs** : <br> : <br> **v.** : <br> : <br> **CAPITAL BLUECROSS, et al.,** : <br>    **Defendants** : | Civil Action No. 1:07-CV-561 <br><br><br><br> (Chief Judge Kane) |

## ORDER

**AND NOW**, on this 25th day of March, 2008, for the reasons set forth in the accompanying memorandum, **IT IS HEREBY ORDERED THAT** Defendants' motion to dismiss (Doc. No. 8) is **DENIED**.

                                               s/ Yvette Kane
                                               Yvette Kane, Chief Judge
                                               United States District Court
                                               Middle District of Pennsylvania